791 P.2d 452

**Shirley McGINNIS, Plaintiff–Appellee, and Cross–Appellant,**

v.

**HONEYWELL, INC., Defendant–Appellant, and Cross–Appellee.**

**No. 18103.**

Supreme Court of New Mexico.

May 2, 1990.

Sherman & Howard, Robert P. Tinnin, Jr., Albuquerque, for defendant-appellant, and cross-appellee.

Girard Street Legal Clinic, Eric Isbell–Sirotkin, Albuquerque, for plaintiff-appellee, and cross-appellant.

## OPINION

MONTGOMERY, Justice.

This is an employee's wrongful-discharge case. The employee, Shirley McGinnis, sued her former employer, Honeywell, Inc., for breach of an implied employment contract and retaliatory discharge, seeking compensatory and punitive damages. The trial court granted Honeywell's motion for a directed verdict on the retaliatory discharge claim and the claim for punitive damages, but submitted the issues of breach of an employment contract and compensatory damages to a jury. The jury found in McGinnis's favor, awarding her damages of $515,161.00 for breach of her employment contract. Honeywell appeals, claiming that there was insufficient evidence of an implied employment contract and that the damage award was excessive. McGinnis cross-appeals, claiming that the trial court erred in directing a verdict on her claims for retaliatory discharge and punitive damages. We affirm the trial court on all issues.

### I.

Shirley McGinnis began work in 1980 as a senior secretary at Honeywell's Albuquerque facility. At the time she applied for employment she executed an employment agreement providing:

My employment is in accordance with any applicable written agreement and applicable personnel practices published to employees, and, *subject to such* agreements or *practices*, may be terminated by me or by Honeywell at any time, but in no case shall it continue after I reach the age of retirement required in the Honeywell retirement or pension plan then applicable to me. [Emphasis added.]

In 1982, McGinnis was promoted to the nonsupervisory position of benefits administrator in the Honeywell Human Resources Department. As benefits administrator, McGinnis became familiar with various personnel policies and manuals, including a "work force realignment guide" setting out policies as to reductions in force. This guide, like the others on which McGinnis relies, was not distributed to employees, but it was maintained in the Human Resources Department and employees could review it and the other guides upon request.

Honeywell underwent two reductions in force at its Albuquerque facility. The first occurred in 1984, when approximately 100 employees (nearly 30 percent of the work force) were laid off. The second took place in late 1985 and early 1986; approximately 20 employees (nearly 10 percent of the work force) were laid off at that time. In the second reduction the Human Resources Department was ordered to reduce its staff by one person. McGinnis's position as benefits administrator was eliminated and she was laid off on January 9, 1986.

The work force realignment guide provided that in the event of a reduction in force, an exempt employee like McGinnis had the option to take a nonexempt position "if he/she formerly held that job family." At the time of the layoff, another employee, Sherri Montoya, held the position of senior human resources clerk, a nonexempt position in the same job family as the secretarial position formerly held by McGinnis. Accordingly, under the policy McGinnis had the option to assume Montoya's position, but it was not offered to her. In addition, the guide provided that if a nonexempt position was held by a temporary employee, an exempt employee had the option to take that position. Although there were no temporary employees in McGinnis's job family immediately before the layoff, one was hired at about the time McGinnis was terminated and later became a permanent employee.

In the spring of 1985, friction began to develop between McGinnis and the manager of the Albuquerque facility, Cliff Moulton. Moulton and other supervisors became critical of McGinnis's "communication skills," and McGinnis was placed on a program for continuing evaluation and improvement of those skills. Meanwhile, at about the same time, McGinnis became concerned about a $128,000 "refund" credited from the home office to the Albuquerque facility's budget for medical expenses. Apparently McGinnis believed that the $128,000 should have been, but was not, received by the facility in cash, and that such a receipt would have increased Honeywell's tax obligations to the state. She "investigated" this apparent discrepancy and complained to management that money was missing and taxes were underpaid. Later that same year McGinnis uncovered what she thought was a discrepancy in Honeywell's books regarding medical cost allocations. She discussed her concerns with various supervisors, who concluded that she did not understand the company's accounting and expense allocation system.

After McGinnis's employment was terminated, she attempted to locate other work, making inquiries at "hundreds" of places, but was unemployed at the time of trial. She was forty-eight years old when laid off and fifty-one at the trial. Her salary at the time of termination was $23,880 per year, and she had retirement benefits which would have paid her $1,573.73 per month on retirement. She was well-educated and had held a teaching certificate, which had expired during her employment with Honeywell. Despite these skills and her apparent employability, no evidence was presented as to any specific job available to her.

McGinnis's complaint alleged that she had "an employment contract" with Honeywell, evidenced by various personnel manuals, oral representations and the like, and that she had been terminated in violation of the policies and procedures set forth in these documents. The case was tried on the theory that Honeywell had breached an implied employment contract, although McGinnis's position and the evidence submitted to the jury were equally consistent with breach of an express contract if one existed. The complaint also charged that

**4**

Honeywell wrongfully terminated McGinnis in retaliation for her having exposed possible fraud or criminal wrongdoing and because she had refused to ignore financial and accounting inconsistencies. The usual allegations of willful, reckless, etc., conduct were made to support the claim for punitive damages. As noted above, the trial court found insufficient evidence to support the retaliatory-discharge and punitive-damage claims but submitted to the jury the issues of breach of employment contract and compensatory damages.

On appeal, Honeywell contends that there was insufficient evidence to support a jury finding that McGinnis had an implied contract of employment which would overcome the presumption that her employment was terminable at will. Honeywell also argues that the jury failed to follow the court's instructions in calculating damages, in that the award was not reduced by any mitigation that would result from alternative employment or, if the jury found she could not mitigate by taking other work, then it failed to discount her damages to present value. On her cross-appeal, McGinnis claims that evidence sufficient to go to the jury was introduced showing that her layoff was a pretext for a disciplinary firing in retaliation for her having explored financial discrepancies in a manner favored by public policy. She also claims that there was sufficient evidence of Honeywell's bad faith in discharging her to permit the jury to assess punitive damages.

## II.

At the outset of our consideration of Honeywell's contentions on the breach-of-contract issue, we are struck by the fact that the parties at trial by and large confined themselves to a dispute about whether or not an implied contract of employment existed, without addressing the point, which strikes us as fairly obvious, that there was an express contract. Honeywell acknowledges that McGinnis signed an employment agreement which, while it provided that her employment could be terminated "at any time," also provided that a termination was subject to "applicable personnel practices published to employees." Thus, if applicable personnel practices permitted her employment to be terminated only under certain conditions and in certain ways, and if such practices were published to employees, and if Honeywell terminated her in violation of those practices, then Honeywell breached an express contract of employment and is liable for the damages sustained by McGinnis as a result. *See Lakeside v. Freightliner Corp.*, 612 F.Supp. 10, 12 (D.Or.1984) (dictum) (in order to prevail on contract claim, employee must show *express or implied* agreement modifying employment-at-will relationship); *Bennett v. Eastern Rebuilders, Inc.*, 52 N.C.App. 579, 582, 279 S.E.2d 46, 49 (1981) (where employer promised at-will employee she would be returned to factory line if her promotion did not work out and then fired her instead, employer breached express contract: "Under the agreement * * * she could be terminated from her position as supervisor at any time; however, such termination was to result not in her discharge from defendant's employ, but in her demotion to her former job on the line. * * * [Employer's] failure to do this amounted to breach of their contract.").

We believe that the theory on which the case was submitted to the jury, while repeatedly emphasizing an *implied* contract of employment, was broad enough to encompass a jury finding that there was an express agreement not to terminate except in compliance with applicable personnel practices. The jury could also have found that the work force realignment guide prescribed such practices, that they were published to employees, and that Honeywell terminated McGinnis without complying with the practices outlined in the guide. The jury was instructed that to establish her claim of breach of implied employment contract, McGinnis had the burden of proving that she had an implied employment contract, that Honeywell's actions breached that contract, and that McGinnis suffered damages as a result of the breach. The jury was also instructed on the definition of an "implied contract" as set out in instruction 803 of our Uniform Jury Instructions: "An implied contract is an agreement in

which the parties by a course of conduct [and custom and usage] have shown an intention to be bound by such agreement." SCRA 1986, 13–803.

The jury might very well have adopted the common-sense view that, since the parties had signed an employment agreement containing a promise by Honeywell to lay off McGinnis only in accordance with certain procedures specified in the work force realignment guide, and if that guide was "published to employees," then the parties' conduct was sufficient to manifest an intention to be bound by the agreement. At no point during the trial or before did McGinnis disavow the possibility that she might assert her claim as a breach of an express employment agreement. While the parties focused their energies on proof or disproof of the various constituent elements of an implied contract—as outlined, for example, in *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 25–26, 766 P.2d 280, 285–86 (1988)—the evidence submitted to the jury and the legal principles on which it was instructed were sufficient to embrace the theory that Honeywell had discharged McGinnis in breach of an employment contract to which it had expressly assented.

■ Were the practices in the work force realignment guide "published to employees"? The ordinary meaning of the word "publish" is "to declare publicly"; "to make generally known"; "to proclaim officially." *Webster's Third New International Dictionary* 1837 (unabridged ed.1961). The legal definition includes: "to make public; to circulate; to make known to people in general." *Black's Law Dictionary* 1109 (5th ed.1979). The evidence on this point was, among other things, that a copy of the guide was kept in the Human Resources Department where McGinnis worked; that she had helped draft the guide; that employees could review the guide on request; that, according to one representative of Honeywell, the policy and procedure manuals applied to McGinnis; and that if an employee had questions concerning Honeywell's procedure and policy on layoffs, the proper place to look for an answer would be in the work force realign-

ment guide. We think that evidence was sufficient to enable the jury to find that the guide—even though, as Honeywell argues, not distributed or disseminated to each employee—was published to employees in the sense of having been made generally known to them and proclaimed officially by Honeywell.

■ Honeywell argues strenuously that the language in the work force realignment guide, as well as in the other manuals relied on by McGinnis, was not sufficiently promissory to form the basis of a contract, citing *Sanchez v. The New Mexican*, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987). Honeywell maintains that these manuals, intended primarily for supervisors, could not reasonably have been construed as contractual offers and could not justifiably have been relied on by McGinnis in accepting an offer which Honeywell never made. Additionally, Honeywell points to a disclaimer in the work force realignment guide providing: "The policy described here is not pertaining to conditions of employment, and, the language is not intended to create a contract between the Albuquerque Facility and its employees."

In emphasizing the formal requisites of contract formation—offer and acceptance, specific promissory language, justifiable reliance by the employee—Honeywell insists that the jury could not properly have found a contract emanating from the work force realignment guide and the other policy manuals on which McGinnis relied. We need not speculate, however, on whether the jury in fact made such a finding; the jury may only have found, and could well have found, that the contract between the parties was contained in the employment agreement, which expressly incorporated, as "practices published to employees," the procedures detailed in the work force realignment guide. The same point applies to Honeywell's reliance on the disclaimer; the language in the guide might not have been accepted by the jury as intended to create the contract, but it could easily have been found to have outlined a set of "practices" which were communicated to employees

and therefore adopted by reference in the employment agreement.

Moreover, as the Tenth Circuit Court of Appeals has ruled, "[a] contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' 'norms of conduct and expectations founded upon them.'" *Zaccardi v. Zale Corp.*, 856 F.2d 1473, 1476–77 (10th Cir.1988) (quoting *Hillis v. Meister*, 82 N.M. 474, 477, 483 P.2d 1314, 1317 (Ct.App.1971)). Here there was evidence that it was Honeywell's policy to take uniform and consistent actions regarding termination and that supervisors were required to follow applicable policies, that Honeywell would follow its written policies to the letter, and that the realignment policy could not be ignored and had to be applied. This was evidence of the parties' norms of conduct and expectations founded upon them. It was evidence sufficient to permit the jury to find that the procedures in the realignment guide, under the parties' express agreement, limited Honeywell's ability to terminate McGinnis "at any time."

As has been indicated, Honeywell (understandably, in light of McGinnis's theory at trial) seeks to force this case into the implied-employment-contract mold. Citing *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987), and *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 625, 627 (Minn.1983), it insists that an enforceable implied contract may arise from an employee handbook or policy statement only where there is language containing specific contractual terms evidencing a contractual offer, a promise disseminated to the employee and reasonably believed by the employee to be an offer, and acceptance of the offer by the employee's continuing to work after learning of the promise. We note that some or all of these elements of an implied employment contract have been either rejected or significantly diluted in other jurisdictions adopting the theory of an implied contract as an exception to the "at will" employment rule obtaining in the absence of such a contract. *See Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 381–83, 710 P.2d 1025, 1037–38 (1985) (en banc) (specific promissory language not essential; parties' intent to be discerned from totality of statements and actions; contractual provision may be enforced without showing reliance) (citing *Leikvold v. Valley View Comm. Hosp.*, 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984)); *Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 324–29, 171 Cal.Rptr. 917, 924–927 (1981) ("independent consideration" not necessary to support promise of continued employment; rendition of services over time, together with other factors, may be sufficient); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 612–619, 292 N.W.2d 880, 885, 892–95 (1980) (provision of employment contract that employee shall not be discharged except for cause may arise from employee's legitimate expectations based on employer's policy statements); *see generally* H. Perritt, Jr., *Employee Dismissal* ch. 4 (2d ed.1987); W. Holloway & M. Leech, *Employment Termination* ch. 2 (1985). *But see Melnick v. State Farm Mutual Auto. Ins. Co.*, 106 N.M. 726, 730, 749 P.2d 1105, 1109 (1988) (employment contract supported by no consideration other than performance of duties and payment of wages is contract for indefinite period and terminable at will); *Garza v. United Child Care, Inc.*, 88 N.M. 30, 31, 536 P.2d 1086, 1087 (Ct.App.1975) (same).

But it is not necessary in this case for us to reach questions of whether or not, or the extent to which, formal requisites of contract formation should be relaxed in the employment-agreement setting. It is enough in this case to recognize as adequately supporting the jury's verdict that, while McGinnis agreed that her employment could be terminated "at any time," Honeywell expressly conditioned its right to terminate her employment on certain policies and procedures communicated to its employees. Honeywell has steadfastly maintained that McGinnis was terminated in the course of an Albuquerque facility-wide reduction in force or "layoff." If so, then McGinnis was entitled to the procedures spelled out in the realignment guide

before the layoff could be implemented as to her. The jury could reasonably have found that Honeywell's failure to afford McGinnis the benefit of those procedures was a breach of its express written contract of employment for which she was entitled to damages.

### III.

Honeywell attacks the jury's damage award as manifesting sympathy, passion or prejudice and as lacking support in the evidence. It claims that the jury failed to follow the court's instructions in computing the award, either by failing to consider evidence under which McGinnis could mitigate her damages or by failing to discount the total damages to present value. We reject these challenges.

We approach Honeywell's challenges with certain well-established precepts in mind. First, of course, "[i]t is * * * within the exclusive province of the jury to determine the proper amount for damages." *Hood v. Fulkerson*, 102 N.M. 677, 679, 699 P.2d 608, 610 (1985). Secondly, "'the mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb a verdict' and the findings of the jury will not be disturbed as excessive except in extreme cases * * *." *Vivian v. Atchison, T. & S.F. Ry*, 69 N.M. 6, 9, 363 P.2d 620, 622 (1961) (quoting *Hall v. Stiles*, 57 N.M. 281, 285, 258 P.2d 386, 390 (1953)).

■ Turning then to Honeywell's specific points, we address first the rule on mitigation of damages. As noted previously, there was evidence before the jury that McGinnis had good academic qualifications (she had graduated from college *magna cum laude*), a postgraduate education (she was to receive a master's degree in December 1988), varied work experience, and good health. She testified that it was her intention to seek a teaching position after she obtained her master's degree. Honeywell asserts that, based on this and similar evidence, the jury was required to reduce McGinnis's damages by an allowance for the alternative employment that she could presumably secure, bearing in mind the principle that the plaintiff is required to mitigate her damages.

Mitigation of damages, however, "is an affirmative defense which the defendant must plead, and the burden of proof is on defendant to minimize the damages." *Acme Cigarette Servs., Inc. v. Gallegos*, 91 N.M. 577, 580, 577 P.2d 885, 888 (Ct.App. 1978) (citations omitted) (citing *State ex. rel. Freeman v. Sierra County Bd. of Educ.*, 49 N.M. 54, 57, 157 P.2d 234, 236 (1945)). The burden was on Honeywell to prove by substantial evidence that McGinnis's damages would be alleviated by future employment opportunities. *See Hansen v. Skate Ranch, Inc.*, 97 N.M. 486, 490, 641 P.2d 517, 521 (Ct.App.1982).

While there was ample evidence before the jury that McGinnis had good employment skills and qualifications, there was no evidence that those skills and qualifications would lead to any specific kind of employment within any specific period of time. To determine that McGinnis would offset her damages by a particular amount from a particular kind of employment at some particular date in the future would have required the jury to speculate on matters that could have been, but were not, presented to them in the form of evidence. Whether this 51-year-old woman, a former schoolteacher with an expired teaching certificate, could have found a job in Albuquerque paying a salary comparable to her job at Honeywell within some defined period of time was not a matter on which the jury could have been allowed to conjecture; it was a matter on which it should have been provided assistance in the form of testimony from one or more knowledgeable witnesses. No such assistance was given the jury in this case; for it to have speculated and reduced McGinnis's damages by an arbitrary amount would have been improper.

Honeywell's contention about the jury's alleged failure to discount the award is answered by a footnote in its own brief-in-chief. The brief summarizes the following facts: McGinnis's salary at the time of the layoff was $23,880 per year. If she had worked until age 65 (fourteen years after

the trial) and received raises of seven percent annually (as the evidence established was a reasonable figure), she would have received a total of $736,464. This amount discounted to present value at eight percent equals $475,210. Adding the lump sum pension amount established by the evidence of $45,504 produces a total figure of $520,714—a figure in excess of the jury verdict of $515,161. The jury's calculations were thus well within the evidence.

■ Although Honeywell's footnote does not expressly attack the implicit assumption that McGinnis would have remained employed at Honeywell until retirement, this assumption too was justified by the evidence. She testified she intended to stay with Honeywell until retirement. Honeywell's policy was to provide "continuing gainful employment for all qualified regular employees." Most of the employees who testified had made their careers at Honeywell and had been employed there for more than twenty years. Her employment agreement, while stipulating that she could be terminated "at any time," qualified this stipulation with certain exceptions: If she was to be laid off in a reduction in force, certain procedures had to be followed; if she was to be discharged for disciplinary reasons, a policy of "progressive discipline" had to be implemented first. Thus, her employment might be terminated "at any time" (for example, if the Albuquerque facility were closed), or in a reduction in force after alternative positions were made available to her, or in a disciplinary termination after the "progressive discipline" procedures were followed, or if she died or became disabled. In the absence of any of these contingencies, McGinnis had a reasonable expectation of employment for an indefinite period and until retirement. See *Pugh v. See's Candies*, 116 Cal.App.3d 311, 324–25, 171 Cal.Rptr. 917, 924–25 (contract for indefinite period); W. Holloway & M. Leech, *Employment Termination* ch. 2, at 71–72 (1985) (discussing *Pugh* in terms of parties' reasonable expectations).

We hold that it was not error for the jury to compute McGinnis's damages based on the assumption that she would have remained employed until retirement. While Honeywell might have been entitled to a reduction of these damages had it proved McGinnis's ability to mitigate them, it offered no evidence of any specific job opportunities available to her and thus failed to prove its affirmative defense.

IV.

We turn now to McGinnis's cross-appeal. She seeks reversal of the directed verdict on her retaliatory discharge claim, arguing, from *Vigil v. Arzola*, 102 N.M. 682, 689, 699 P.2d 613, 620 (Ct.App.1983), *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), that she was discharged because she performed acts that public policy encourages. McGinnis argues extensively that her termination was an affront to public policy and that there was a sufficient "nexus" between the policy she asserts and the reasons for her discharge.

■ We find it unnecessary to consider these arguments. It is clear that McGinnis cannot recover more than one compensatory-damage award, *Hood v. Fulkerson*, 102 N.M. 677, 680, 699 P.2d 608, 611 (1985), and we are affirming the compensatory-damage award to her for Honeywell's breach of contract. In *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.*, 106 N.M. 19, 20, 738 P.2d 513, 514 (1987), we held that "if an employee is protected from wrongful discharge by an employment contract, the intended protection afforded by the retaliatory discharge action is unnecessary and inapplicable." We approved a trial court's instructing the jury that it could find either a breach of contract or retaliatory discharge but not both.

■ *Silva* held that damages for emotional distress ordinarily are not recoverable in an action for breach of an employment contract. 106 N.M. at 20, 738 P.2d at 514. In the subsequent (and recent) case of *Chavez v. Manville Products Corp.*, 108 N.M. 643, 649–50, 777 P.2d 371, 377–78 (1989), we distinguished the tort action for retaliatory discharge from the contract claim for breach of an express or implied employment agreement and held that damages for emotional distress may be recov-

ered in the former type of action. Thus, there might be reason in this case to remand for a trial on retaliatory discharge had McGinnis sought emotional-distress damages as part of her retaliatory-discharge claim. Her complaint sought no such damages, and there was no proof of emotional distress at trial. Accordingly, she has been fully compensated by the jury's verdict on her claim for breach of contract, and no purpose would be served by reversing the directed verdict on the retaliatory-discharge claim (assuming there were grounds for reversal) at this point.

## V.

Finally, we address McGinnis's assertion that the trial court erred in directing a verdict against her on her claim for punitive damages.

Punitive damages are allowable in a case involving breach of an employment contract "only upon a showing of bad faith by an employer during the course of a plaintiff's employment or in the manner and method used to terminate him." *Newberry v. Allied Stores*, 108 N.M. 424, 432, 773 P.2d 1231, 1239 (1989); *see Boudar v. E.G. & G., Inc.*, 106 N.M. 279, 283, 742 P.2d 491, 495 (1987). The mere breach of a contract does not itself create a right to punitive damages; even if deliberate, the breach may be justified in some sense if the promisee can be fully compensated for the loss and the benefit to the promisor from the breach may provide society with a net gain—i.e., the breach may be "efficient." *See. Patton v. Mid–Continent Sys.*, 841 F.2d 742, 750 (7th Cir.1988) (opinion of Posner, J.) (even deliberate breach is not necessarily blameworthy; efficiency may be promoted by allowing promisor to break his promise if he makes good promisee's actual losses). Since punitive damages are imposed for the limited purposes of punishing the defendant and deterring others from similar conduct, *Sanchez v. Wohl Shoe Co.*, 108 N.M. 276, 278, 771 P.2d 984, 986 (Ct.App.), *cert. quashed,* 108 N.M. 217, 770 P.2d 539 (1989), to support an award there must be some evidence of a "culpable mental state." *Gonzales v. Sansoy*, 103 N.M. 127, 130, 703 P.2d 904, 907 (Ct.App.1984). Here, as in *Newberry*, there was no substantial evidence of such a mental state on the part of Honeywell's agents, and the directed verdict ruling out punitive damages was proper.

The Honeywell employee responsible for terminating McGinnis was her immediate supervisor, Paul Cook. Although, as discussed previously, the evidence was sufficient for the jury to find that, in selecting McGinnis as the Human Resource Department employee to be laid off, he violated the work force realignment guide by not offering her Sherri Montoya's position or the temporary position advertised at about the same time, there was no evidence that he or anyone else at Honeywell intended to injure McGinnis, or acted in heedless disregard of her rights, or terminated her as a pretext for a disciplinary firing. There was ample evidence that Cliff Moulton was dissatisfied with McGinnis months before her layoff, and McGinnis points to this evidence as support for an inference that the layoff was a disguised termination for disciplinary reasons. However, the work force realignment guide, which provides the predicate for McGinnis's breach-of-contract claim in the first place, expressly provided that "job performance," along with qualifications and length of service, was a primary consideration in identifying employees for "realignment" of the work force. Cook was thus permitted by the guide to consider McGinnis's performance in selecting an employee for the reduction in force, although he was not permitted to use the reduction as a substitute for an involuntary termination due to poor performance or misconduct. There is no substantial evidence that Moulton caused Cook to discharge McGinnis in order to circumvent the "progressive discipline" procedures. We conclude that the trial court properly directed a verdict on this issue.

The judgment of the district court is affirmed in its entirety.

IT IS SO ORDERED.

RANSOM and BACA, JJ., concur.