815 P.2d 1161

**CONSTRUCTION CONTRACTING
& MANAGEMENT, INC.,**
Plaintiff–Appellee,

v.

**Ron McCONNELL and Don Pattison,
Defendants–Appellants.**

No. 18359.

Supreme Court of New Mexico.

July 9, 1991.

James T. Roach, Janet Santillanes, Albuquerque, for defendants-appellants.

Richard Addis, Albuquerque, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

In this case we resolve an issue expressly left undecided in *Louis Lyster General Contractor, Inc. v. City of Las Vegas*, 83 N.M. 138, 146, 489 P.2d 646, 654 (1971): whether a contractor who abandons or repudiates a construction contract before completion of the project may be held liable for liquidated damages for the delay in completion. In addition, we review the instructions by which this breach-of-contract case was submitted to the trial jury and decide that the trial court erroneously submitted issues of liability when it had previously ruled, correctly, that liability was established as a matter of law. Because we remand for a new trial on the issue of damages, we also decide issues concerning the contractor's liability for punitive damages and concerning the admissibility of certain evidence offered for impeachment purposes.

### I.

On August 8, 1986, defendants/counterclaimants Ron McConnell and Don Pattison, the owners of a tract of land on Tramway Boulevard in Albuquerque, New Mexico, entered into a contract with plaintiff/counterdefendant Construction, Contracting & Management, Inc. (CCM), to build a restaurant on the site for $361,000. William Pinson, an employee of CCM, negotiated the contract, which was signed by the two owners and C.J. Mead, the president of CCM. Shortly thereafter, Pinson left CCM's employment. When Pinson's replacement reviewed the contract and con-

cluded it would be unprofitable, CCM informed McConnell and Pattison on September 16, 1986, that CCM wanted $75,000 more than the contract price. The owners refused this request and demanded that CCM perform under the terms of the written contract. After completing preliminary site preparation, CCM halted work on the project and filed suit to rescind the contract. In response, McConnell and Pattison filed a counterclaim for breach of contract.

On the first day of trial in November 1988, the court granted summary judgment to McConnell and Pattison on the issue of CCM's liability for breach of contract. However, the issue was nevertheless submitted to the jury, which returned a verdict in favor of CCM in the amount of $13,451.33 for site preparation and in favor McConnell and Pattison on their counterclaim in the amount of $11,000 as damages for CCM's breach. The trial court granted McConnell and Pattison's motion to set aside the verdict in favor of CCM, but denied their motion for additur or a new trial and entered judgment against CCM for $11,000 on the counterclaim. McConnell and Pattison appeal, asserting six points of error and contending that because the jury was confused by the court's assertedly erroneous instructions, the damages awarded were inadequate.

We agree with the general contention that following the trial court's grant of summary judgment on the issue of breach of contract, the remaining issue for the jury was the nature and extent of the damages to which McConnell and Pattison were entitled under the terms of their contract with CCM.[1] Within that general framework, we address each of the six points.

## II.

### A.

The owners first argue that the court below erred in refusing to direct a verdict on the issue of liability, because the construction contract was clear and unambig-

uous and was breached by CCM. The court denied the motion on the theory that Article 2 of the contract was ambiguous.

Article 2, entitled "The Work," reads as follows:

The Contractor shall perform all the Work required by the Contract Documents for

The construction of the Wold [sic] Plum Restaurant, per plans and specifications from Lawrence Garcia and Associates and specifications from J.E. Kuykendall.

All equipment and fixtures per plans and specifications on the above referenced project as agreed upon, and *specifically including* Roof tile and installation, Carpeting as per owner's specification, stained glass, mini-blinds, turning lamps, cabinets, stainless steel hoods, shelves, corners and door guards, Tiffany lamps and Lampost, site lighting, clear hemlock paneling, 2 fire hydrants and all necessary pro-rata charges, water meter, etc. Owner only to pay for those fixtures and furniture not mentioned in specifications. [Emphasis added.]

This provision contained various alterations—various words deleted and other words substituted in a larger typeface; but all alterations had been made before the contract was signed by the parties. There is no suggestion that the contract was altered in any way after it was signed by Mead on behalf of CCM.

McConnell and Pattison argue that Article 2 clearly states that the contractor, CCM, was to provide the listed items as part of the contract price. Pinson, who negotiated the contract on behalf of CCM, also testified it was his understanding that the listed items were included in the contract price. In contrast, CCM adduced evidence that it understood the article to mean that CCM would purchase the items, then be reimbursed at cost plus 10 percent— treating the listed items, in effect, as change orders. After hearing testimony by both parties, the court concluded that

---

1. This basic proposition is essentially—and perhaps inadvertently—admitted by CCM in its brief: "Ultimately, the issue in the present case was the amount of damages actually incurred by McConnell and Pattison as the result of CCM's failure to perform."

the article was ambiguous and denied the motion for a directed verdict on that basis.

The question whether particular contract language is ambiguous is, of course, a question of law. *Young v. Thomas*, 93 N.M. 677, 679, 604 P.2d 370, 372 (1979). Absent a finding that the language is reasonably and fairly susceptible of different constructions, no ambiguity will be found. *Levenson v. Mobley*, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). Moreover, as we have repeatedly observed, "The mere fact that the parties are in disagreement on construction to be given to the contract does not necessarily establish an ambiguity." *Id.*; *see Vickers v. North Am. Land Devs. Inc.*, 94 N.M. 65, 68, 607 P.2d 603, 606 (1980).

Despite the parties' current disagreement on the issue of whether the contractor or the owner was to bear the cost of the items listed in Article 2 of the contract, we conclude that the article is not ambiguous. We disagree with CCM's argument that the phrase "as agreed upon" indicates that the listed items constituted possible change orders to be determined in the future. Not only does the plain language indicate that the listed items were to be provided by the contractor as specifically included within the scope of "the Work" in the contract; many of the items listed in Article 2 are reiterated in Addendum # 1, which was incorporated into the contract before it was signed by the parties.

Because the court below had previously granted partial summary judgment on the issue of liability for breach of contract (thereby determining that a valid contract existed and had been breached), we conclude that, since the contract was unambiguous, the court erred in not granting the owners' motion for a directed verdict as to liability. *See Archuleta v. Pina*, 86 N.M. 94, 95, 519 P.2d 1175, 1176 (1974) (trial court has no discretion on directed verdict rulings). Consequently, the only issue that should have reached the jury on McConnell and Pattison's counterclaim was the extent of damages to which they were entitled as a result of CCM's breach.

### B.

Closely related to the first issue is the owners' second contention: that the trial court erred in not informing the jury that summary judgment had been granted on the issue of liability. As indicated above, we agree that the issue of CCM's liability for breach of contract should not have been submitted to the jury. It presented a false issue, which may well have confused the jury. *See State ex rel. State Highway Comm'n v. Atchison, T. & S.F. Ry.*, 76 N.M. 587, 589, 417 P.2d 68, 70 (1966) (error to instruct on a false issue).

Instruction No. 5 was the "statement of the issues" instruction. *See* SCRA 1986, 13–301 *et seq.*[2] It submitted to the jury the questions whether CCM had agreed to build the restaurant for $361,000, whether the terms of the contract required CCM to provide the items specifically included in Article 2 of the contract, and whether CCM's breach of contract damaged McConnell and Pattison. By instructing the jury that CCM denied these claims and that the burden was on McConnell and Pattison to prove them, the court left the jury to determine whether there was an agreement to build the restaurant for $361,000, whether the contract covered the specific items (which we have held it did), and whether there was a breach which damaged McConnell and Pattison. The last part of the instruction told the jury that CCM claimed it had learned that there was a substantial difference of opinion as to what was required in performance of the contract and that CCM proceeded no further because the parties could not arrive at an agreement on the contract's meaning. This effectively submitted to the jury the question whether there was a breach in light of the parties' differing positions on the meaning of the contract (which we have held was unambiguous).

---

2. The Introduction to Chapter 3 of the Uniform Jury Instructions–Civil states: "[I]t is the duty of the court to submit to the jury only those issues which are supported by the evidence *and determinative of the case.*" SCRA 1986, 13–301 to –308, Introduction (emphasis added).

Other instructions reinforced the erroneous impression that the jury was to determine whether a breach had occurred, even though the court determined this issue at the outset of the trial and was clearly correct, given that CCM had repudiated the contract on September 16, 1986. Instruction No. 6 informed the jury what was meant by "burden of proof" on breach of contract.[3] Instruction No. 11 stated that a party has breached a contract if it has failed properly to fulfill its duty under the contract. Instruction No. 12 told the jury what to do if the contract was ambiguous, which we have ruled it was not. Instruction Nos. 16 and 24 were the standard uniform instructions telling the jury not to discuss damages until they had first determined liability. The jury thus had the mistaken impression it was to determine whether there was a contract and whether it was breached before considering damages.

The court had ruled in its order granting defendants' motion for partial summary judgment that the motion was "granted as to the issue of liability only." Having so ruled (and absent revision or rescission of the ruling during trial, *see Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 727, 749 P.2d 1105, 1106 (1988)), the court erred in instructing the jury that it was to determine whether or not a contract existed and was breached. The court correctly granted partial summary judgment on these issues, so all that remained was for the jury to determine the extent of defendants' damages flowing from the breach.

### III.

### A.

McConnell and Pattison next argue that the court erred in refusing to submit the issue of punitive damages to the jury. Absent a showing of malicious, fraudulent, or oppressive conduct, or conduct committed recklessly with a wanton disregard of the wronged party's rights, punitive dam-

ages are generally not awarded in breach of contract cases. *Romero v. Mervyn's,* 109 N.M. 249, 255, 784 P.2d 992, 998 (1989); *Ranchers Exploration & Dev. Corp. v. Miles,* 102 N.M. 387, 390, 696 P.2d 475, 478 (1985). In particular, punitive damages have been uniformly denied in breach of contract cases involving delay or nonperformance of construction contracts. Annotation, *Recovery of Punitive Damages for Breach of Building or Construction Contract,* 40 A.L.R. 4th 110, § 3 (1985).

In New Mexico, it is well settled that because the limited purpose of punitive damages is to punish and deter persons from certain conduct, there must be some evidence of a culpable mental state. *McGinnis v. Honeywell, Inc.,* 110 N.M. 1, 9, 791 P.2d 452, 460 (1990); *Jessen v. National Excess Ins. Co.,* 108 N.M. 625, 628, 776 P.2d 1244, 1247 (1989). Certainly the mere breach of a contract does not imply any basis for punitive damages without evidence of such a culpable mental state or other form of overreaching, malicious, or wanton conduct. *See Romero,* 109 N.M. at 256–58, 784 P.2d at 999–1001. Indeed, even an intentional breach, where the nonbreaching party is fully compensated for his loss, may promote the interests of society as a whole and, unless there is an intention to inflict harm on the nonbreaching party or conduct which violates community standards of decency, will not serve as a basis for punitive damages. *See McGinnis,* 110 N.M. at 9, 791 P.2d at 460 (breach may be economically efficient); *Romero,* 109 N.M. at 256, 784 P.2d at 999 (suggesting that breaches of contract committed intentionally for legitimate business reasons will not support punitive damages).

In this case, although the owners claim they were entitled to punitive damages, they offered no evidence to support the claim and only cited CCM's concerns about profitability as the motive for breaching the contract. Certainly, under

---

**3.** Instruction No. 6 was requested by McConnell and Pattison, but since the court had ruled that the issue would go to the jury, we do not find in this requested instruction a waiver of defen-dants' position that the issue, having been decided by the court, should not have been submitted to the jury.

our economic system, a party's inability to perform a contract without incurring a substantial financial loss would constitute a legitimate business reason and, although subjecting the party to full liability for the nonbreaching party's compensatory damages, would not, without more, expose the breaching party to liability for punitive damages. Since no evidence was offered of any culpable mental state on CCM's part or of conduct violating community standards of decency (such as dishonesty or deceit, or a strong party's taking advantage of a weaker party's vulnerability), the court was correct in refusing to submit the issue of punitive damages to the jury.

## B.

McConnell and Pattison's fourth assignment of error is that the court erred in admitting testimony of Daniel Gear, the contractor who replaced CCM, regarding McConnell's reputation for truth and veracity. The issue is whether the particular form of testimony was proper to attack the credibility of McConnell. Pursuant to SCRA 1986, 11–608(A), the credibility of a witness may be attacked by evidence in the form of an opinion or as to reputation, but only as it relates to the witness's character for truthfulness or untruthfulness and only after a proper foundation is laid.

 McConnell and Pattison objected at trial to Gear's testifying as to his opinion of McConnell's reputation on the ground that a proper foundation for reputation testimony was not established. We agree that, although both opinion and reputation testimony are admissible under Rule 11–608, they require different factual foundations. The record reveals that a foundation was laid for Gear to testify as to his *opinion* of McConnell's veracity (based upon his own repeated dealings with him and his impressions from other people), but no foundation was laid for any *reputation* testimony. Gear was not asked, for example, how long he had lived in the community or whether he was familiar with McConnell's reputation for truth and veracity.

We agree with McConnell and Pattison that the court below erred in admitting an amalgam of opinion and reputation testimony without a proper foundation. The jury is entitled to know the factual context that gives rise to a witness's claimed ability to describe accurately another witness's reputation in the community. By its nature, reputation testimony carries a veneer of community consensus, to which the jury may give greater weight than the mere opinion of one witness—which makes the laying of a factual foundation particularly important. In this case, Gear's "opinion as to reputation" was based on his personal experience with McConnell and two incidents: the facial expression of a third party when McConnell's name was mentioned and a city clerk's allegation that, approximately ten years before, McConnell might have changed the ultimate use of a building contrary to the original building permit.

While these incidents, related on cross-examination, may have contributed to Gear's personal opinion of McConnell, they failed to indicate any community consensus that might be described as reputation. The jury might wish to consider the incidents in determining the weight to give Gear's opinion, but it is not permissible for the court to allow opinion testimony to be disguised as reputation testimony to give it greater effect. We conclude, in sum, that based on the only foundation laid, Gear should have been limited to expressing his own opinion of McConnell's veracity, rather than offering the jury his "opinion as to McConnell's reputation in the community."

## IV.

We turn next to the owners' fifth point on appeal: that the trial court erred in not instructing the jury that McConnell and Pattison were entitled to liquidated delay damages of $250 per day for the period from January 15, 1987 (when, under the contract, the building should have been completed) and June 15, 1987 (when the building was finally completed).[4] Article 3

---

**4.** Under the contract, liquidated damages were to run from the date substantial completion was required, which was December 15, 1986. Final completion was due thirty days later. McCon-

of the contract, entitled "Time of Commencement and Substantial Completion," provided for substantial completion of the building within 120 days, with liquidated damages set at $250 per day for every day the project was not substantially completed. Final completion was to be achieved within 150 days. The contract provided that the work was to begin by August 15, 1986; substantial completion was then due by December 15, 1986, and final completion by January 15, 1987.

The court instructed the jury that the owners were claiming as damages:

(1) The difference between the contract price and the cost to the Defendants of having another do the work.

(2) Interest on the amount of the contract cost overage.

(3) Late charges for the period from one week after the signing of the contract [August 15, 1986] through October 31, 1986 [the date the replacement contractor began].

Before addressing whether the owners were entitled to a different jury instruction on the amount of liquidated damages, we first must determine whether the delay provision is applicable where the contractor abandons or repudiates the contract instead of continuing to perform and completing (or substantially completing) it later than the date fixed in the contract.

Although the general rule in the early part of this century was that liquidated damage clauses were inapplicable when the contractor had abandoned the contract, by the 1940's the trend was to the contrary. Comment, *Applicability of Liquidated Damages Clause to Delays Where Building Contractor Abandons*, 35 Ill L Rev 74, 77 (1940). This shift in perspective is also apparent when one compares Williston's 1920 edition of *Contracts* with the current, 1961 edition: The early edition flatly stated that liquidated damages could not be recovered if the contract was totally abandoned, while the current edition concludes that the courts are far from uniform on this issue.

*Compare* 2 S. Williston, *The Law of Contracts* § 785, at 1501–02 (1920) *with* 5 S. Williston, *A Treatise on the Law of Contracts* § 785, at 734–37 (W. Jaeger 3d ed. 1961). A review of various jurisdictions indicates that there is still a split of authority on the issue. *Compare, e.g., City of Elmira v. Larry Walter, Inc.*, 150 A.D.2d 129, 546 N.Y.S.2d 183 (1989) (liquidated delay damage clause does not apply when the contractor abandons work prior to stipulated completion date), *aff'd*, 76 N.Y.2d 912, 564 N.E.2d 655, 563 N.Y.S.2d 45 (1990), *with City of Boston v. New England Sales & Mfg. Corp.*, 386 Mass. 820, 438 N.E.2d 68 (1982) (liquidated delay damages are recoverable after the contractor abandons work).

In New Mexico, two cases address the issue of liquidated delay damage clauses. In *Gruschus v. C.R. Davis Contracting Co.*, 75 N.M. 649, 655, 409 P.2d 500, 504 (1965), we held that where a contract between a contractor and subcontractor contains a liquidated delay damage clause, the agreed figure governs the amount of recovery and the fact that actual damages either exceed or fall short of the stipulated amount is not relevant. We noted: "As a general rule, enforcement of such a clause will only be denied when the stipulated amount is so extravagant or disproportionate as to show fraud, mistake or oppression." *Id.* Although CCM argues that *Gruschus* holds that a liquidated delay damage clause precludes *any* award of actual damages, we held in *Louis Lyster General Contractor, Inc. v. City of Las Vegas*, 83 N.M. 138, 489 P.2d 646 (1971), that an award of actual damages unrelated to delay does not preclude an award of liquidated damages for delay-related damages. We observed that "[t]he vice to be guarded against is a duplication of damages." *Id.* at 146, 489 P.2d at 654.

 We reiterate that while a liquidated delay damage clause is generally controlling on the amount the jury should be permitted to award for delays, the jury

---

nell and Pattison make no claim that they were entitled to liquidated damages for delays in substantial completion commencing December 15,

but only that the court erred in not permitting the jury to assess such damages for delays occurring after January 15.

should also be instructed that the clause does not compensate the party for non-delay-related damages, such as the higher cost of the replacement contractor. We conclude that such a clause is applicable where a contractor abandons or repudiates the contract, but that it applies only to delay-related damages.

In the instant case, the jury awarded McConnell and Pattison $11,000 total damages, which presumably included damages both related and unrelated to the delay in completion of the building. The owners argue, however, that had the jury been properly instructed that CCM had breached the contract and that the liquidated delay damages should be calculated at $250 per day for so much of the post-January 15 delay as was attributable to CCM's breach, the amount would have been considerably greater and consistent with the evidence. We substantially agree with this argument.

The trial court was concerned that the evidence did not enable the jury to do otherwise than speculate on the delays attributable to CCM's breach. However, we see no basis for the delay period the court submitted to the jury. The beginning date of August 15, 1986, was incorrect (CCM admits as much), since site preparation work was begun in mid-August and completed in early September. It was not until September 16 that CCM made clear its intention not to perform. Likewise, the ending date, October 31, was four days after the replacement contractor, Gearcon, agreed to take over the job. CCM asserts that the jury's award of $11,000 was for the forty-four days from September 16 to October 31. That is doubtless true, but the period selected has nothing to do with the delay in completion actually occasioned by CCM's breach.

 Under well-settled contract law in New Mexico, the nonbreaching party is entitled to damages to put it in as good a position as it would have occupied had the contract been performed. *Allen v. Allen Title Co.,* 77 N.M. 796, 798, 427 P.2d 673, 675 (1967); SCRA 1986, 13–827. Had CCM performed its contract, the restaurant would have been completed by January 15, 1987. It was not completed until June 15 of that year. The liquidated damage clause was intended to fix, by agreement, the amount of damages the owners might suffer as the result of such a delay. Interest on borrowed money and inability to collect rent on the premises are two easily envisioned items of such delay damages; others are certainly imaginable. The liquidated damage clause, where it is tied to damages for delays, eliminates the necessity for argument over this point and settles the amount of the breaching party's liability for this kind of damage. *Gruschus,* 75 N.M. at 655, 409 P.2d at 504.[5]

Because of the errors we have identified in the court's jury instructions, a new trial on the issue of compensatory damages is necessary. At that trial it will be incumbent on McConnell and Pattison to produce evidence (and persuade the jury) as to what portion of the post-January 15 delay period is reasonably attributable to CCM's breach in refusing to perform the contract. *See City of Boston,* 386 Mass. at 824, 438 N.E.2d at 70 ("[T]he period of delay for which liquidated damages may be recovered must be limited to the period of reasonable delay.... Unreasonable delays by any successor contractor should not be charged against the party who abandoned the work.").

In addition to considering the extent to which McConnell and Pattison might be entitled to damages for delay, the jury heard testimony as to damages that were not delay-related. These included, *inter alia,* the added cost of the replacement

5. We reject CCM's suggestion that McConnell and Pattison did not actually suffer any such delay-related damages because they were able to pass along to their tenant their increased costs, whether arising from delays or from other factors. The ability of an injured party to recover his loss from another source ordinarily does not diminish the liability of the party causing the loss. *See McConal Aviation, Inc. v. Commercial Aviation Ins. Co.,* 110 N.M. 697, 700, 799 P.2d 133, 136 (1990) (collateral source rule in breach of contract case). Besides, the ability to increase a tenant's rent to recover additional costs might have a variety of other adverse consequences to the owners, such as—as only one example—an unhappy tenant.

contractor. McConnell and Pattison were entitled to such damages, in addition to (reasonable) liquidated damages for the delay in completion. *See Lyster*, 83 N.M. at 146, 489 P.2d at 654. Although the parties disagreed as to the exact figure applicable, McConnell and Pattison provide a strong argument that their added cost was something in excess of $106,000. We cannot help but conclude that due to the errors in the jury instructions, the jury was confused not only as to whether it could award both delay- and non-delay-related damages, but also as to whether the owners were entitled to both under the evidence.

Therefore, we agree with McConnell and Pattison's final point, that the court erred in denying their motion for a new trial on the issue of damages. Accordingly, we reverse the judgment of $11,000 in favor of McConnell and Pattison and remand for a new trial on the issue of defendants' damages on their counterclaim.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.