20 F.3d 383
 128 Lab.Cas. P 57,712, 28 Fed.R.Serv.3d 996
 William C. WATSON, Kelly Macias, and Rufugio Macias,
Plaintiffs, Counter-Defendants, Appellees,
v.
Norman C. BLANKINSHIP, individually, and d/b/a Norman C.
Blankinship Enterprises and Saddle Mt. Land &
Cattle Company, Defendant,
Counter-Claimant, Appellant, and
Bill BYRD, individually, and Gene MORRISON, individually,
Defendants, Counter-Claimants.
 No. 92-2181.
 United States Court of Appeals,
Tenth Circuit.
 April 1, 1994.
 
 Robert N. Singer of Singer, Smith & Williams, P.A., Albuquerque, NM, for defendant-appellant.
 Erenio Gutierrez Jr., Albuquerque, NM, for plaintiffs-appellees.
 Before SEYMOUR, Chief Judge, SETH, and LOGAN, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 Appellant challenges the subject matter jurisdiction for claims against him for breach of implied contract and breach of covenant of good faith and fair dealing, alleging the amount in controversy was not met. We find jurisdiction was proper. We agree with Appellant's challenge of the district court's failure to sever claims against a second defendant. Furthermore, we find the jury's verdict for Plaintiffs awarding damages for breach of implied contract was not supported by the evidence and is therefore REVERSED.
 
 
 2
 William Watson, Kelly Macias, and Rufugio Macias were employees of Saddle Mountain Land & Cattle Company, owned by Norman Blankinship. The main business of the ranch was to maintain fields used for feeding cattle. Watson served as manager of the operation and had hired his daughter Kelly and her husband Rufugio Macias to work on the ranch.
 
 
 3
 In the fall of 1989, Blankinship informed Plaintiffs that he was ceasing operations at the ranch and that they no longer had a job with him. Watson had worked and lived at the ranch for 13 years, Kelly Macias had worked for 8 years, and Rufugio Macias for 4 years. None of the Plaintiffs had signed a written contract, nor was there a policy manual in existence. Watson received a letter, dated October 18, 1989, confirming that the Plaintiffs would "remain on regular payroll at the same level until December 31, 1989." After Watson had received the letter, but before December 31, a newly hired employee of Blankinship, Bill Byrd, hit Watson on the mouth, incurring a doctor's bill of $99.00 but doing no permanent damage.
 
 
 4
 Watson retired in January 1990. Kelly Macias began working at another job in October 1990 and Rufugio Macias became employed in February 1990. Both of these jobs were at higher salaries, although a discrepancy exists as to the value of alleged "fringe benefits" lost when the Plaintiffs were fired.
 
 
 5
 Plaintiffs filed suit against Blankinship, Bill Byrd, and Gene Morrison in the United States District Court for the District of New Mexico claiming four causes of action. Plaintiffs sued Blankinship for breach of implied contract of employment and breach of covenant of good faith and fair dealing based on bad faith termination. The judge dismissed the breach of covenant claim during trial and did not allow the issue of punitive damages to go to the jury.
 
 
 6
 One cause of action was against Gene Morrison, another employee, and Bill Byrd for tortious interference with contractual rights. The district court judge dismissed the claim against Morrison prior to trial and dismissed the claim against Byrd during trial.
 
 
 7
 Finally, Watson individually sued Byrd for assault and battery and sued Blankinship on the basis of vicarious liability. The vicarious liability claim was dismissed by the district court prior to trial. The remaining assault and battery claim against Byrd went to trial with the other claims, but the jury returned a verdict for Byrd, thus granting no damages for the assault.
 
 
 8
 The breach of implied contract claim went to the jury, which returned a verdict in favor of the Plaintiffs, granting actual damages of $198,500 for Watson, $28,366.50 for Kelly Macias, and $23,159.50 for Rufugio Macias. After the trial, Blankinship moved for a judgment notwithstanding the verdict, which the court denied. However, the judge granted Blankinship's motion for remittitur and reduced the damages awarded to $132,706 for Watson, $11,000 for Kelly Macias, and $2,300 for Rufugio Macias. No issue relating to the remittitur has been raised in this appeal.
 
 
 9
 Prior to trial, Blankinship had sought to have the Plaintiffs' claims dismissed, arguing they did not meet the amount in controversy requirement for federal jurisdiction. The judge found that because Plaintiffs were seeking punitive damages, the claim could very possibly exceed $50,000, thus the amount in controversy requirement was met. Blankinship also sought a severance of Byrd's claims, which the court denied.
 
 
 10
 Blankinship appeals from the court's final order and argues four issues on appeal. First, whether Kelly Macias' and Rufugio Macias' claims properly met the amount in controversy requirement for subject matter jurisdiction under 28 U.S.C. Sec. 1332. Second, whether Watson's claim against Byrd for assault and battery was improperly joined with the claims against Blankinship. Third, whether sufficient evidence existed to create a cause of action on an implied contract of employment. Fourth, whether the court erred in refusing to give a jury instruction on consideration for an implied contract.
 
 Amount in Controversy
 
 11
 When federal subject matter jurisdiction is challenged based on the amount in controversy requirement, the plaintiffs must show that it does not appear to a legal certainty that they cannot recover at least $50,000. See St. Paul Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S.Ct. 586, 590, 82 L.Ed. 845; Gibson v. Jeffers, 478 F.2d 216, 220 (10th Cir.). Plaintiffs must have a good faith belief that the amount in controversy is met. Gibson, 478 F.2d at 220. Every separate and distinct claim must individually meet the amount in controversy. See Lonnquist v. J.C. Penney Co., 421 F.2d 597, 599 (10th Cir.). We review de novo a trial court's ruling concerning jurisdictional questions. FDIC v. Oaklawn Apts., 959 F.2d 170, 173 (10th Cir.).
 
 Claims of Rufugio and Kelly Macias
 
 12
 Blankinship argues that Kelly Macias' and Rufugio Macias' actual damages for the alleged breach of implied contract of employment did not approach the required $50,000 amount in controversy. The trial court agreed with this in its Memorandum and Order filed September 23, 1991, and Kelly and Rufugio Macias do not seem to contest this on appeal. Thus the issue of whether Kelly and Rufugio Macias met the amount in controversy requirement hinges on whether the allegation that they were entitled to punitive damages was made in good faith. See Bell v. Preferred Life Assurance Society, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (punitive and actual damages can be aggregated to meet amount in controversy requirement).
 
 
 13
 According to Blankinship, Kelly Macias and Rufugio Macias acted in bad faith in filing their claims in federal court on both legal and factual grounds. First, Blankinship contends that New Mexico does not recognize a claim for breach of covenant of good faith and fair dealing; therefore, legally, Appellees could not have filed this claim in good faith. Second, the facts alleged by Appellees do not show bad faith termination or that Blankinship acted fraudulently, thus, there is no basis for punitive damages and the amount in controversy was not met.
 
 
 14
 These two Appellees claim that New Mexico recognizes a cause of action for breach of covenant of good faith and fair dealing, which is recognized as both a contract cause of action and a tort equivalent to wrongful discharge. Furthermore, punitive damages are available for bad faith actions such as a breach of the implied contract and a breach of the covenant of good faith and fair dealing. Appellees Kelly and Rufugio Macias argue that the totality of the circumstances surrounding their employment and the means of termination in addition to the allegations of crop fraud demonstrate Blankinship's bad faith in terminating their employment.
 
 
 15
 The district court correctly ruled that as a matter of law, these two Appellees can bring the breach of covenant claim in both contract and tort. Although New Mexico does not recognize a cause of action for breach of covenant of good faith and fair dealing in an at-will employment relationship, Melnick v. State Farm Mutual Automobile Ins. Co., 106 N.M. 726, 749 P.2d 1105, these Appellees are claiming this was an implied contract of employment, not at-will; therefore, the breach of covenant claim is based in contract, flowing from the alleged employment contract. A breach of implied covenant of good faith and fair dealing can also be brought in tort as it is equivalent to the tort of wrongful discharge. Salazar v. Furr's, Inc., 629 F.Supp. 1403, 1409 (N.M.). Pleading the breach of implied contract action together with an alternative claim of breach of covenant of good faith and fair dealing in tort and contract was proper. New Mexico law permits punitive damages in contract cases if malicious or wanton conduct, such as an absence of good faith, or the public interest is at issue. See Romero v. Mervyn's, 109 N.M. 249, 784 P.2d 992, 998, 1001; Boudar v. E.G. & G., Inc., 106 N.M. 279, 742 P.2d 491, 495. Furthermore, punitive damages are available in tort, as well as contract, where bad faith is shown. Boudar, 742 P.2d at 495. Such allegations are asserted by these two Appellees who argue that the courts should foster good employment relationships and not allow people to misuse federal funds through fraud. As the district court stated, "Plaintiffs' allegation of a conspiracy to defraud the government is a serious one." Aplt.App. at 62. Since we determined that these Appellees could legally assert both the breach of contract and the breach of covenant claims with a request for punitive damages, we must now decide whether they proved their good faith.
 
 Claims of the Maciases and Good Faith
 
 16
 Based on the pleadings, affidavits, and transcripts offered prior to trial, the district court found Appellees had a good faith belief in bringing their claims. Appellees argue this is sufficient to maintain jurisdiction, even if claims are subsequently dismissed thereby reducing their total possible recovery. These Appellees correctly state that the amount in controversy requirement is determined at the time the complaint was filed. Klepper v. First American Bank, 916 F.2d 337, 340 (6th Cir.); Emland Builders, Inc. v. Shea, 359 F.2d 927, 929 (10th Cir.). Just because the court dismisses certain claims, which reduce the amount of recovery, or the jury does not find plaintiff is entitled to the required amount, does not necessarily destroy jurisdiction or prove that the plaintiff acted in bad faith. St. Paul, 303 U.S. at 292, 58 S.Ct. at 591; Klepper, 916 F.2d at 340; City of Boulder v. Snyder, 396 F.2d 853, 856 (10th Cir.). "A distinction must be made, however, between subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action." Jones v. Knox Exploration Corp., 2 F.3d 181, 183 (6th Cir.).
 
 
 17
 If at trial, evidence or lack thereof shows that these Appellees did not possess a good faith belief that they were entitled to the proper minimum jurisdictional amount "and that [the] claim was therefore colorable for the purpose of conferring jurisdiction, the suit must be dismissed" for lack of subject matter jurisdiction. Boulder, 396 F.2d at 856. "[W]here 'the "proofs" adduced at trial conclusively show that the plaintiff never had a claim even arguably within the [required] range,' a diversity action must be dismissed." Jones, 2 F.3d at 183 (quoting Jimenez Puig v. Avis Rent-A-Car System, 574 F.2d 37, 39 (1st Cir.)); see also Emland Builders, 359 F.2d at 930.
 
 
 18
 "When dismissal for lack of jurisdictional amount also constitutes a decision on the merits, the court should be even more reluctant to dismiss the case." Gibson, 478 F.2d at 220-21. This is the type of situation presented in this case. At the pleading stage, this case seemed to raise sufficient factual questions which were tied into the merits of the claims and required a jury determination.
 
 
 19
 According to Blankinship, there was no factual basis for punitive damages because the Maciases had no proof against Blankinship of "bad faith." However, in the pleadings, Appellees alleged that Blankinship was involved in a conspiracy to defraud the federal government by deliberately causing crops to fail, thus enabling Blankinship to collect insurance. When Appellees allegedly would not go along with the plan, they claim they were fired. However, Appellees could not support this claim at trial and the judge granted a directed verdict for Blankinship dismissing the bad faith and punitive damages from consideration by the jury. Blankinship argues that this lack of proof shows bad faith by the Maciases; furthermore, evidence that they were offered continued employment, which they rejected, refutes a charge of bad faith termination.
 
 
 20
 In challenging the district court's holding, Blankinship points to many factual discrepancies adduced at trial which he claims call into question Appellees' good faith belief in the availability of punitive damages. In particular, Blankinship notes that he fired the Maciases before Byrd, who allegedly put into action the plan to defraud the government, took over the operation. Therefore, Appellees' claim that they were fired because of the fraud scheme is not plausible since Byrd had not even been hired before Blankinship notified Appellees that they were terminated. Furthermore, there was no evidence that Byrd ever filed any claims, nor that the Maciases attempted to disobey Blankinship or Byrd which may have prompted termination. Aplt.Brief at 14, 17-18. Byrd's assault on Watson was not ratified by Blankinship; therefore, this does not tend to show bad faith termination by Blankinship. Additionally, testimony by the Plaintiffs does not even support an allegation of fraud. For example, Blankinship cites the trial testimony of Watson, without providing a copy of the relevant portion of the transcript, that Watson stated Blankinship "would not knowingly participate in any fraud." Aplt.Brief at 17.
 
 
 21
 Appellees counter with the following facts which support their "allegations of a crop insurance scam": planting wheat on chemically treated soil; planting wheat on all fields, regardless of their condition; sudden change from cattle feeding operation to sowing wheat; not watering crops; and a profit made with only three head of cattle. Aple.Brief at 12-13. Furthermore, Appellees point out that at the time of trial, Saddle Mountain had not been sold, which was the supposed reason given for their termination. The Maciases also claim they were asked to remain "under false pretenses," but it is unclear from the record what Appellees mean by this. Aple.Brief at 14.
 
 
 22
 At the time the pleadings were filed, we agree with the district court that it appeared that Appellees had a good faith belief that they were entitled to punitive damages; it could not be proven to a legal certainty that they were not entitled to them. The lack of evidence supporting a claim for punitive damages at trial does not establish that Appellees believed that they were never entitled to punitive damages and that the claim "was therefore colorable for the purpose of conferring jurisdiction." St. Paul, 303 U.S. at 289, 58 S.Ct. at 590. The evidence does not show that Appellees "feigned [the] allegations solely" to meet the federal jurisdiction requirements. Emland, 359 F.2d at 929. We hold that Appellees did not act in bad faith; therefore, the district court acted properly in exercising jurisdiction.
 
 
 23
 Watson's claims for breach of implied contract and breach of covenant of good faith and fair dealing met the amount in controversy requirement based on actual damages alone. Each individual Plaintiff thus satisfied the necessary minimum jurisdictional amount for the claims of breach of implied contract and breach of covenant of good faith and fair dealing; therefore, the district court acted properly in exercising its jurisdiction.
 
 Rule 20(a)--Permissive Joinder
 
 24
 Blankinship contends that Watson's claims against Byrd for assault and battery and tortious interference with employment relationship were improperly joined with the claims against him, which created such prejudice that he should be granted a new trial. At a pretrial conference the district court denied Blankinship's motion for severance, but gave no formal memorandum or order. We review a district court's decision regarding a Rule 20(a) joinder based on an abuse of discretion standard. R.J. Enstrom Corp. v. Interceptor Corp., 555 F.2d 277, 281 (10th Cir.) (discussing joinder under Rule 25(c)).
 
 
 25
 Blankinship argues that Watson's claims against Byrd were improperly joined for two reasons. First, both claims against Byrd did not meet the requirements of Rule 20(a) for permissive joinder of parties. Second, the assault and battery claim did not meet the amount in controversy requirement for subject matter jurisdiction and therefore should not have even been filed in federal court.
 
 
 26
 Rule 20(a) allows for joinder of defendants where there is a "right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."
 
 
 27
 According to Blankinship, Watson's two claims against Byrd were improperly joined with the claims against him because there was no question of law or fact common to both Blankinship and Byrd and the claims did not arise out of the same transaction. Blankinship contends that he was prejudiced because having the jury hear about the violent tort "would likely prejudice the jury against Blankinship who had engaged Byrd to supplant Watson in the first place." Aplt.Brief at 26. Furthermore, the jury heard testimony relating to Byrd's alleged plan to defraud the government which may have created bias against Blankinship.
 
 
 28
 Watson counters that Rule 20 allows liberal joinder of claims against multiple defendants, see Vulcan Society v. Fire Dep't of White Plains, 82 F.R.D. 379, 387; therefore, the claims against Byrd were properly joined because they stemmed from Watson's wrongful termination and showed bad faith. Specifically, Watson was suing Blankinship and his employee for a series of bad faith acts relating to his wrongful termination, such as being punched and as Kelly Macias testified, "[t]he manner in which he [Blankinship] terminated us...." Aplt.Brief at 33. Watson argues, in the alternative, that if the claims were improperly joined, it constituted harmless error under Rule 61. Blankinship suffered no prejudice "because the jury didn't see fit to punish Byrd." Aple.Brief at 15.
 
 
 29
 There was an alleged remote connection between the claims against Blankinship and Byrd which was Watson's claim against Blankinship for vicarious liability since Byrd was Blankinship's employee. However, this claim was dismissed before trial. The other claim against Byrd for tortious interference with an employment relationship did not involve Blankinship's relationship with Watson and therefore was not related to Blankinship at all.
 
 
 30
 The joining of the assault and battery claim and tortious interference claim against Byrd is stretching the limits of Rule 20(a) in this particular situation. The link establishing that the claims against Byrd were proof of Blankinship's bad faith termination was the vicarious liability claim against Blankinship for Byrd's assault which was dismissed prior to trial. Once that claim was dismissed, the connection between Byrd's assault and battery and the wrongful termination no longer existed. Although the situations giving rise to the various claims occurred in the same time period, Watson's claims against Byrd were not sufficiently related to those lodged against Blankinship.
 
 
 31
 Blankinship's second argument against joinder is that Watson's claim against Byrd for assault and battery did not meet the amount in controversy requirement, thus it was improperly before the federal court. Again, the basis of subject matter jurisdiction depends on the availability of punitive damages for the assault and battery since Watson's actual damages were only $99.00, for which Watson was reimbursed. New Mexico's Uniform Jury Instructions Sec. 13-1827 state that punitive damages are allowed for conduct by a party that is malicious, willful, reckless, wanton, grossly negligent, fraudulent or made in bad faith. Furthermore, punitive damages are allowed when it serves the good of the public.
 
 
 32
 The facts giving rise to the assault and battery committed by Byrd does not rise to the level of any of the standards stated above such that $50,000 would be an appropriate sanction; therefore, the assault and battery claim against Byrd did not meet the amount in controversy requirement. The district court did not have subject matter jurisdiction over the assault and battery claim; therefore, the claim is vacated.
 
 
 33
 If the two claims against Byrd had met the amount in controversy, they should not have been joined under Rule 20(a) with the claims against Blankinship as discussed above. The district court erred in denying Blankinship's motion to sever. However, Blankinship is not entitled to a new trial since he has failed to show prejudice. The evidence about defrauding the government was likely to have been heard even if Byrd were not a party, since Plaintiffs alleged bad faith by Blankinship. Furthermore, Byrd was found not liable for the assault, and Blankinship had no role in or relationship to the incident, as evidenced by the dismissal of the vicarious liability claim. The joinder was harmless error. Under Rule 61,
 
 
 34
 "no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."
 
 
 35
 Since we have determined that proper jurisdiction exists for Plaintiffs' claims against Blankinship, we turn to Blankinship's appeal of the jury's decision in favor of the Plaintiffs for breach of implied contract.
 
 
 36
 Breach of Implied Contract of Employment--Substantial
 
 Evidence
 
 37
 Blankinship claims that there was not substantial evidence to support the jury's finding of an implied contract of employment and its breach. We review a jury's finding based on whether the record contains substantial evidence, viewed most favorably towards the prevailing party, to support the decision. Kitchens v. Bryan County Nat'l Bank, 825 F.2d 248, 251 (10th Cir.).
 
 
 38
 Blankinship argues because New Mexico presumes an "at-will" employment status in order to find a breach of an implied contract of employment, Appellees had to show a meeting of the minds and prove consideration sufficient to change the presumed at-will employment into a "for cause" contract. See Melnick v. State Farm Mutual Automobile Insurance Co., 749 P.2d at 1109. Plaintiffs counter that pursuant to McGinnis v. Honeywell, Inc., 110 N.M. 1, 791 P.2d 452, 457, there is no need to prove "formal contractual requirements" for an implied contract for employment. Aple.Brief at 23. However, McGinnis does not support Plaintiffs' position because the court expressly declined "to reach questions of whether or not, or the extent to which, formal requisites of contract formation should be relaxed in the employment-agreement setting." McGinnis, 791 P.2d at 457.
 
 
 39
 Furthermore, Plaintiffs cite Kestenbaum v. Pennzoil Co., 108 N.M. 20, 766 P.2d 280, 284, for the proposition that New Mexico recognizes that an implied contract of employment can be found based on oral statements by the employer or "particular representations or conduct." "In overcoming the presumption [of at-will employment], it is not any single act, phrase or expression, but the totality of all of these, given the circumstances and the parties' situation and objectives, which will control." Id. 766 P.2d at 286.
 
 
 40
 The cases cited by the parties suggest some variations among prior New Mexico decisions. However, the New Mexico Supreme Court recently revisited the question of implied contracts in Hartbarger v. Frank Paxton Co., 115 N.M. 665, 857 P.2d 776, and explicitly discussed the holdings of prior New Mexico cases and then set forth the definitive test for establishing the existence of an implied contract. The court equated an implied employment contract to an implied-in-fact contract which does not "require a factual showing of additional consideration or mutual assent to the implied term." Hartbarger, 857 P.2d at 780.
 
 
 41
 "[S]ince 1980 when we recognized an implied employment contract ..., we have not required that additional consideration be shown factually....
 
 
 42
 "... We hold today that where there is proof of a promise sufficient to support an implied contract, the consideration sufficient to support the implied contract will be implied as a matter of law by the court whether the promise was part of the original employment agreement or was made later in modifying the employment relationship."
 
 
 43
 Id. at 780-81 (citation omitted).
 
 
 44
 The court continued that in order to create an implied employment contract, the promise must "be sufficiently explicit to give rise to reasonable expectations of termination for good cause only." Id. at 783. Moreover, courts may consider "the totality of the parties' relationship, circumstances, and objectives in determining whether the presumption of at-will employment has been rebutted." Id. The court concluded that in the past it had "upheld findings of an implied employment contract provision ... where the facts showed that the employer either has made a direct or indirect reference that termination would be only for just cause or has established procedures for termination...." Id. at 779. However, the court has "upheld findings that there was no implied contract in cases where the alleged promise by the employer was not sufficiently explicit." Id. at 780.
 
 
 45
 Plaintiffs argue that the evidence they relied on, including Blankinship's statements and conduct, when taken in light of the "total relationship" shows that they were not at-will employees. The specific conduct includes the length of their employment, the powers delegated to Watson such as power of attorney and taking out loans in his own name for the business, and Kelly Macias' authority to sign checks. Further supporting evidence includes the fact that Watson and the Maciases worked at Saddle Mountain as a family and that Watson raised his own cattle on the ranch. Watson also claims that he hired the Maciases as an agent of Blankinship and that in the past, Watson, acting as manager for Blankinship's ranch, only fired employees for cause.
 
 
 46
 Statements used to support Plaintiffs' contention include the following excerpts from Watson's testimony at trial:
 
 
 47
 "Q. What type of assurances did Mr. Blankinship give you?
 
 
 48
 "A. ... [T]hat as long as I did the job and could handle it out there and could oversee it, that we had a place as long as we lived, as long as we wanted to live there.
 
 
 49
 "Q. Was that intended for you only?
 
 
 50
 "A. For my wife and I...."
 
 
 51
 Aplt.App. at 163.
 
 
 52
 Kelly and Rufugio Macias claim that they relied on statements by Watson intimating that as long as they did their work, they had a place to live. However, there is no support given for this. Watson's testimony continues:
 
 
 53
 "Q. Did he mention Kelly and Cuco [Rufugio], that they could also continue?
 
 
 54
 "A. No.... It was pretty well understood that as long as I was there and they did their work, that they would have a job."
 
 
 55
 Aplt.App. at 162. Furthermore, Plaintiffs claim that at trial Blankinship said that he would not have fired Watson without good cause.
 
 
 56
 Blankinship characterizes the evidence given at trial differently. According to Blankinship, the words that Watson claims show an implied contract were meant only as assurances that Watson and his wife would have a place to live; this did not mean they would always have a job. Furthermore, the Maciases were hired by Watson, not Blankinship; therefore, they could not have had an implied contract with Blankinship. Kelly Macias admitted at trial that she never discussed her employment with Blankinship:
 
 
 57
 "Q. Did he [Blankinship] ever discuss any terms of your employment with you?
 
 
 58
 "A. No, he did not."
 
 
 59
 Aplt.App. at 166.
 
 
 60
 "Q. He [Watson] never said anything at all about when and under what conditions you could be terminated, did he?
 
 
 61
 "A. No.
 
 
 62
 "Q. And neither did Mr. Blankinship.
 
 
 63
 "A. No."
 
 
 64
 Aplt.App. at 168.
 
 
 65
 Other cases in New Mexico highlight particular evidence the courts consider in reaching decisions about implied contracts. In Kestenbaum, the court found an implied contract by relying on employment negotiations that the job was long term and permanent "if the plaintiff did his job;" plaintiff's requirement for long term employment; employee testimony that employer only fired for good cause and an insurance policy and severance pay plan which did not discuss termination without cause. See Newberry v. Allied Stores, Inc., 108 N.M. 424, 773 P.2d 1231, 1234-35 (finding that "[t]he manual, words and conduct of the parties ... gave rise to an implied contract of employment").
 
 
 66
 However, the Hartbarger court found that the plaintiff's claim that his employer had a "custom of retaining employees for a long time and ... usually only fir[ed] employees for a good reason " did not indicate that the plaintiff had a for-cause termination agreement. Hartbarger, 857 P.2d at 784. Furthermore, statements by the employer that "as long as he kept up his sales and took care of what he was doing he would not have anything to worry about" and that the company would not "leave its employees hanging" in the event of a sale, when considered in the context in which they were made did not show anything other than an at-will employment relationship. Id. at 785. These comments were meant for reassurance and the employer was only expressing his opinion about future job security.
 
 
 67
 In Watson's and the Maciases' situation, the only proof given is a few words and general conduct. The only statements made were ambiguous, promising Watson a place to live as long as Blankinship owned Saddle Mountain. Blankinship made no statements to the Maciases at all. The overall relationship that Watson and the Maciases had worked for a long time and had responsibilities does not support the finding of an implied contract of employment. Because an implied contract of employment did not exist, Plaintiffs were properly terminated. The district court is REVERSED and Plaintiffs are not entitled to damages.
 
 Jury Instruction--Consideration
 
 68
 Blankinship contends that the court improperly refused to give a jury instruction which explained the necessity of a finding of consideration for the making of an implied contract of employment.
 
 
 69
 We review the district court's tendering of an individual jury instruction de novo. United States v. Harmon, 996 F.2d 256, 258 (10th Cir.). An error results in a "reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." Street v. Parham, 929 F.2d 537, 539-40 (10th Cir.) (quoting Durflinger v. Artiles, 727 F.2d 888, 895 (10th Cir.)). The jury instructions must "fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them." United States v. Denny, 939 F.2d 1449, 1454 (10th Cir.).
 
 
 70
 Since New Mexico does not require a finding of consideration in order to establish an implied contract of employment, the court did not err in refusing to grant this instruction. See Hartbarger v. Frank Paxton Co., 115 N.M. 665, 857 P.2d 776; Newberry v. Allied Stores, Inc., 108 N.M. 424, 773 P.2d 1231.