**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARCUS FOOD COMPANY,

        Plaintiff–Appellee,

v.

ROBERT DIPANFILO,

        Defendant–Appellant.

No. 10-3285

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:09-CV-01261-EFM)**

---

Patricia M. Dengler, Brown, Dengler & O'Brien, LLC, Wichita, Kansas, for Defendant–Appellant.

Will Wohlford (Susan R. Schrag with him on the brief), Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, Kansas, for Plaintiff–Appellee.

---

Before **O'BRIEN**, **GILMAN**, and **HOLMES**, Circuit Judges.[*]

---

**GILMAN**, Circuit Judge.

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Court Judge for the Sixth Circuit, sitting by designation.

Marcus Food Company, a Kansas corporation based in Wichita, entered into an oral agreement in 1999 with Robert DiPanfilo, a citizen of Toronto, Canada, under which DiPanfilo served as an independent sales and purchasing agent for the company. The agreement included a provision that rendered DiPanfilo liable to Marcus Food for 45% of any net losses on his accounts. After the parties' relationship ended 10 years later, Marcus Food attempted to collect on debts allegedly owed it under the agreement by suing DiPanfilo in the United States District Court for the District of Kansas.

A default judgment was entered against DiPanfilo in the district court following his failure to appear or respond to the complaint. DiPanfilo moved to set aside the default judgment six-and-a-half months later on the grounds that it was void for lack of jurisdiction and/or because his delay was due to excusable neglect. After a hearing, the court denied DiPanfilo's motion, finding personal jurisdiction over DiPanfilo, subject matter jurisdiction over the case, and insufficient support for his excusable-neglect argument. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Marcus Food and DiPanfilo commenced negotiations in 1999 that led to their oral business arrangement. They agreed that DiPanfilo would serve as a sales and purchasing agent of Marcus Food for potential clients located primarily outside the United States. Although the parties dispute who initiated the

-2-

negotiations, they agree that the discussions took place in Colorado and that a Marcus Food executive participated by telephone from Kansas. The record does not include any additional details about their negotiations.

DiPanfilo worked out of his office in Toronto and utilized warehouses for the storage of Marcus Food products in Canada. Marcus Food provided the financing and maintained legal title to the products under the terms of their agreement. DiPanfilo worked as an independent contractor to make connections for Marcus Food in the global meat-products market and to buy and sell such products on behalf of the company. In this role, DiPanfilo was in regular communication with several different departments at Marcus Food's Kansas headquarters over the course of their 10-year relationship. Although the parties dispute the frequency of these contacts, the record reflects that communications occurred on at least a monthly basis—if not weekly or even more frequently at times—and covered a range of topics from prospective sales and customers to issues regarding accounts receivable and payable.

DiPanfilo reported sales and confirmed purchases for Marcus Food via facsimile or on the company's internet-based proprietary database. According to DiPanfilo, none of the paperwork for these orders went through Marcus Food's headquarters in Kansas. Marcus Food, however, asserts that oversight for DiPanfilo's activities came directly from its Wichita headquarters. The company also reimbursed DiPanfilo for the costs of his office rent and business expenses

pursuant to invoices that DiPanfilo submitted to the company via mail, email, or facsimile. DiPanfilo visited Kansas at least twice during their relationship, once for business in August 2008 and earlier for a social event honoring a Marcus Food coworker in March 2005.

In February 2009, Marcus Food terminated its business relationship with DiPanfilo, asserting that DiPanfilo breached their agreement when he failed to pay his 45% share of the net losses on his accounts. The company sent him a letter dated May 19, 2009 that detailed these outstanding debts, including $76,959 for products sold at a loss in closed sales transactions, $36,806 for products sold at a loss in open sales transactions, $13,224 in losses from currency transactions in November 2008, $67,582 in losses in accounts receivable for all of DiPanfilo's transactions, $20,000 estimated in lost inventory, $59,541 in lost product removed without authorization from the Coolbridge Cold Storage facility, and $6,000 in lost product abandoned at the McAllen Cold Storage facility.

DiPanfilo's 45% share of the net loss detailed in the letter totaled $280,112. Marcus Food asked for a response to the letter by June 5, 2009. DiPanfilo never responded.

On August 28, 2009, Marcus Food filed a complaint against DiPanfilo in the federal district court in Wichita. DiPanfilo received personal service of the summons and complaint in Toronto from a Canadian process server on September 9, 2009. When DiPanfilo did not respond to the complaint by October 9, 2009,

the Clerk of the court entered a default against him. On October 14, 2009, the court entered a default judgment against DiPanfilo in the amount of $207,585. This amount was based on the allegations in the complaint and an affidavit from Marcus Food's Chief Operating Officer, Keith A. Alter. Alter averred that "[t]he claim asserted in the Complaint is for a sum certain amount of $207,585," but did not provide additional information beyond what was set forth in the complaint.

The complaint listed three categories of damages: $155,972 in net losses from closed sales transactions, $38,839 in net losses from the accounts receivable of two specific customers, and $12,774 in lost product from the Coldbridge Cold Storage facility. This reduction from the claims stated in Marcus Food's May 19, 2009 letter apparently reflects a refinement to an amount that the company believed was readily provable. The district court did not hold a hearing on the issue of damages.

After receiving the service documents, DiPanfilo was unsuccessful in finding counsel licensed in both Canada and Kansas. He then sought to locate an attorney licensed only in Kansas, but had difficulty finding counsel unencumbered by a conflict of interest. DiPanfilo ultimately retained counsel in December 2009. That was when he first learned about the default judgment entered against him two months earlier.

On March 23, 2010, approximately six-and-a-half months after being served and three months after learning of the default judgment, DiPanfilo filed a

motion to set aside the judgment as void. He argued that the district court lacked personal jurisdiction over him as a Canadian citizen and lacked subject matter jurisdiction over the case due to a lack of proof or judicial findings as to the amount in controversy. As an alternative basis for setting aside the default judgment, DiPanfilo argued that his delay was due to excusable neglect in that he spent several months locating counsel, that he had a meritorious defense based on Marcus Food breaching the agreement first, and that Marcus Food would not be prejudiced since it had not yet attempted to collect on the judgment. He attached to his motion a personal affidavit supporting these arguments.

The district court heard oral argument on DiPanfilo's motion on August 30, 2010, pursuant to a notice that asked the parties specifically to address the issue of excusable neglect. Both parties acknowledged this request on the record. The only explanation for DiPanfilo's delay provided by his counsel, however, was the following:

> I think it probably has to do with doing the work, getting everything ready, getting the facts involved to prepare the affidavit, and making sure that he could approve the affidavit.

> There were times when I would try to locate him and he was not available. He does travel some. He does have access to the Internet and a phone. By the same token, he's trying to work and earn his money in order to pay his expenses, including legal fees. So I think that would be what the issue is.

In a memorandum and order issued on October 5, 2010, the district court determined that it had personal jurisdiction over DiPanfilo and subject matter

-6-

jurisdiction over the dispute.  The court therefore denied the motion to set aside

the default judgment as void.  In addition, the court concluded that DiPanfilo had

failed to show excusable neglect, thus denying his motion on that ground as well.

This timely appeal followed.

## II.  ANALYSIS

### A.      Standard of review

Rule 60(b) of the Federal Rules of Civil Procedure allows the district court

to relieve either party from a judgment or final order.  Relief under this rule is

"extraordinary and may only be granted in exceptional circumstances."

*Dronsejko v. Thornton*, 632 F.3d 658, 664 (10th Cir. 2011) (internal quotation

marks omitted).  The abuse-of-discretion standard generally applies to the review

of a district court's decision to deny a motion to set aside a default judgment for

excusable neglect under Rule 60(b)(1).  *Hukill v. Okla. Native Am. Domestic*

*Violence Coal.*, 542 F.3d 794, 796-97 (10th Cir. 2008).

Where a party moves for relief on the ground that the judgment is void

under Rule 60(b)(4), however, this court must apply the de novo standard of

review.  This is because "relief is not a discretionary matter; it is mandatory"

where Rule 60(b)(4) is properly invoked.  *Id.* at 797 (internal quotation marks

omitted).

### B.      The district court properly found that it had personal jurisdiction over DiPanfilo

DiPanfilo argues that the default judgment against him should be set aside as void because the district court lacked personal jurisdiction over him and failed to affirmatively find that it had jurisdiction prior to entering the default judgment. "A default judgment in a civil case is void if there is no personal jurisdiction over the defendant." *Id.* at 797 (internal quotation marks and brackets omitted). We apply the de novo standard of review to the exercise of personal jurisdiction over a foreign defendant. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010).

Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law of the forum state. Fed. R. Civ. P. 4(e). The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: first, that the exercise of jurisdiction is sanctioned by the state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment. *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1159. Kansas's long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process principles. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090 (10th Cir. 1998). Consequently, this court "need not conduct a statutory analysis apart from the due process analysis." *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1159.

The due process analysis is also two-fold: First, DiPanfilo must have "minimum contacts" with the forum state, demonstrating that he "purposefully

-8-

availed" himself of the protections or benefits of the state's laws and "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-76 (1985); *see also Emp'rs Mut. Cas. Co.*, 618 F.3d at 1159-60 (reiterating the *Burger King* standard). Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" *TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.*, 488 F.3d 1282, 1287-88 (10th Cir. 2007) (quoting *Burger King*, 471 U.S. at 473, 478). The court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 1288 (internal quotation marks omitted).

If DiPanfilo is found to have the requisite minimum contacts with Kansas, then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him "does not offend 'traditional notions of fair play and substantial justice.'" *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1979) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). DiPanfilo bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, the fourth of

which applies only by analogy, in deciding whether the exercise of jurisdiction would be fair:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

*Id.* (brackets omitted); *see also OMI Holdings, Inc.*, 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *TH Agric. & Nutrition, LLC*, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

The district court here found that it had specific personal jurisdiction over DiPanfilo because his alleged contacts with Kansas through his dealings with Marcus Food is the focus of the lawsuit. *See TH Agric. & Nutrition, LLC*, 488 F.3d at 1287 (discussing the requirements for specific jurisdiction). Both parties have confined their arguments to specific jurisdiction; neither has asserted that general jurisdiction, which arises out of "continuous and systematic contacts" with the forum state, would be more appropriate. *See Trujillo v. Williams*, 465 F.3d 1210, 1218 n.7 (10th Cir. 2006) (discussing the standard for general

jurisdiction). We will therefore confine our analysis to specific jurisdiction as well.

Even limited to the facts not disputed by the parties, the record in this case supports the conclusion that DiPanfilo had sufficient minimum contacts with Kansas to justify personal jurisdiction over him. The parties' agreement created precisely the type of "continuing relationship" on which the Supreme Court grounded personal jurisdiction in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 478, 486 (1985). In particular, their conduct over the course of the 10-year agency relationship reveals sufficient evidence of DiPanfilo's contacts with Kansas. *See TH Agric. & Nutrition, LLC*, 488 F.3d at 1288 (instructing courts to consider "the parties' actual course of dealing" as part of the jurisdictional analysis).

DiPanfilo communicated with Marcus Food's staff at its headquarters in Kansas on at least a monthly basis. He admits that these communications were more frequent at times—weekly, or even daily, on occasion. In addition, he admits that he received benefits from Marcus Food in the form of reimbursements for his office rent and expenses. Marcus Food processed and paid these expenses from Wichita pursuant to requests for reimbursement that DiPanfilo submitted to the Kansas office. And DiPanfilo personally came to Kansas on at least two occasions as a result of his relationship with Marcus Food.

The parties' conduct demonstrates that they intended to create a continuing relationship in which DiPanfilo would serve as an agent of Marcus Foods and would receive compensation in exchange for his work. His contacts with Kansas arise out of this relationship and are sufficient to meet the threshold for minimum contacts supporting jurisdiction. By entering into this contractual relationship and benefitting therefrom, DiPanfilo availed himself of the forum and should have anticipated that he might be haled into court there in the event of a contractual dispute. *See Burger King*, 471 U.S. at 473-76.

This analysis finds support in our decision in *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355 (10th Cir. 1990), where we affirmed the Kansas district court's determination that it had personal jurisdiction over the defendant, an employee of Equifax. The employee worked exclusively in California. His only significant employment-related physical presence in Kansas was his attendance at a training session as an independent contractor, and when he was summoned for a reprimand shortly before he resigned. There were no intermediaries between him and his employer in Kansas. His only direct supervision came from company employees in Kansas. The company's Kansas office reimbursed expenses for the defendant's offices and provided those offices with necessary materials and supplies. And the defendant had contact with company employees in Kansas by telephone, mail, and through electronic data communications.

In both *Equifax Services* and in the present case, "[t]he underlying dispute arises from defendant's relationship with his employer, and that relationship was a [Canada]-Kansas one." *Id.* at 1359. Indeed, the only material differences between the facts in *Equifax Services* and those here are that the defendant in *Equifax Services* "admitted at the hearing that he knew that any disputes regarding his employment contract would originate in Kansas," *id.* at 1358, and that he had entered into a written employment contract with his employer, which specified that Kansas law would apply to any disputes under the contract, *id.* at 1359. Although in *Equifax Services* the defendant's admission was evidence of the reasonable foreseeability of possible litigation in Kansas, it was the confluence of factors listed above (and present here for DiPanfilo) that should have made litigation in Kansas reasonably foreseeable to the defendant. Similarly, although the choice of law provision "*reinforce[d]* defendant's 'deliberate affiliation with the forum State and the reasonable forseeability [sic] of possible litigation there,'" *id.* (emphasis added) (quoting *Burger King*, 471 U.S. at 482), the provision was not *necessary* for our determination that the Kansas district court had personal jurisdiction over him.

We further conclude that the district court's exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1979) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Only the first factor (the burden

-13-

on the defendant) of the five that we must consider under *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1080 (10th Cir. 2008), favors DiPanfilo, since litigating in a U.S. court located 1,200 miles from Toronto is clearly a burden on him. In contrast, the remaining *Dudnikov* factors, which address the plaintiff's interest, the forum's interest, and systemic interests, either favor Marcus Food or are neutral.

DiPanfilo argues that the third count in the complaint, involving the improper removal of product from a Canadian warehouse, can more easily be resolved in a Canadian forum. Whether or not this is true, the other two counts of the complaint, involving claims for 45% of the net losses, would more efficiently be litigated in a Kansas forum because most of the documents and witnesses involved in this case are located in Kansas, and the litigation has already proceeded to a resolution in the Kansas forum, albeit by default. At best, therefore, the fourth factor (the systemic interest "in obtaining the most efficient resolution of controversies") favors neither of the parties.

This court's sliding-scale approach mandates that DiPanfilo present a strong showing of unreasonableness, since his business relationship with Marcus Food creates relatively strong contacts with the forum state. *See TH Agric. & Nutrition, LLC*, 488 F.3d at 1292. We conclude that DiPanfilo has failed to demonstrate that the balance of these factors renders the district court's

jurisdiction over him unreasonable, given the strength of his relationship with Marcus Food in Kansas.

Finally, DiPanfilo argues for the first time on appeal that the district court erred when it failed to state affirmatively that it had jurisdiction over DiPanfilo before entering the default judgment. He did not raise this argument before the district court. This court will not consider arguments presented for the first time on appeal absent extraordinary circumstances. *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 757 (10th Cir. 2011) (applying the "extraordinary circumstances" test set out in *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1143 (10th Cir. 2009)). DiPanfilo does not explicitly argue that the failure to consider this argument would create a miscarriage of justice, but he does assert in a more general sense that the default judgment entered against him is void in part because the district court failed to determine its jurisdiction prior to entering the judgment against him. Regardless of whether this is sufficient to demonstrate a miscarriage of justice, we conclude that DiPanfilo's argument fails on the merits. *See Gomes v. Williams*, 420 F.2d 1364, 1367 (10th Cir. 1970) (considering the appellant's arguments on the merits despite his failure to raise it before the district court due to the importance of due process rights).

As support for his new position, DiPanfilo cites *Dennis Garberg & Associates, Inc. v. Pack-Tech International Corp.*, 115 F.3d 767 (10th Cir. 1997), in which this court held that "a district court must determine whether it has

jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case." *Id.* at 772. In *Garberg*, the defendants appeared for the purpose of contesting jurisdiction and filed a motion to dismiss on that ground. *Id.* at 770. The district court, however, explicitly refused to consider the defendants' motion until they complied with earlier restraining orders entered against them by the court. *Id.* This court took issue with the district court's approach and reaffirmed that, before turning to the merits of the case, the district court must determine the propriety of its jurisdiction when presented with an explicit challenge. *Id.* at 772-73.

In *Garberg*, this court used the phrase "must determine whether it has jurisdiction," 115 F.3d at 772, rather than the phrase "must *state* that it has jurisdiction." This suggests that an explicit statement on the record is not necessary, provided that the district court in fact determines that it has jurisdiction before proceeding to the merits. *Id.*; *see also Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986) (concluding that "the district court has an affirmative duty to *look into* its jurisdiction . . . ." (emphasis added)).

As a general proposition, a district court is not required to affirmatively state that it has jurisdiction over the parties before it. We presume in the absence of a challenge that the court properly found jurisdiction where the lower court is silent on this point and the record supports such a finding. *Cf.* Charles A. Wright, Arthur R. Miller, et al., 13D Federal Practice & Procedure § 3536 (3d ed. 2011)

(applying this principle to a determination of subject matter jurisdiction). *Garberg* presented a unique case where we were unable to draw this presumption because the district court explicitly stated that it would not consider jurisdiction in the first instance. 115 F.3d at 772-73.

In sum, we do not read *Garberg* to require an overt statement of jurisdiction unless a challenge has been raised by the defendant or, as other cases have suggested, where the complaint lacks any allegations supporting jurisdiction. 115 F.3d at 772-73; *see also Deville v. Wilson*, 208 F. App'x 629, 631 (10th Cir. 2006) (concluding that the district court should have been on notice that jurisdiction might be wanting because the complaint contained no facts about the nonresident defendant's minimum contacts, and directing the district court to consider and state the basis for its jurisdiction before proceeding to the merits).

In the present case, DiPanfilo did not initially challenge the court's jurisdiction, and the complaint and the other documents in the record contained sufficient allegations to support a finding of jurisdiction over him. Without a timely challenge raised by DiPanfilo, the district court had no reason to believe that its jurisdiction was wanting. DiPanfilo now argues that the district court should have been aware of a potential jurisdictional problem because the complaint stated that he was a Canadian citizen. But the complaint also included facts detailing DiPanfilo's relationship and contacts with Marcus Food and the state of Kansas that support a prima facie finding of jurisdiction.

-17-

Unlike in *Garberg*, the district court here did not refuse to consider its jurisdiction, and we may presume that it followed the proper procedures. This presumption is bolstered by the fact that the district court held a hearing to confirm its jurisdiction over DiPanfilo as soon as he raised the issue in his motion to set aside the default judgment. DiPanfilo was then afforded an opportunity to challenge the district court's jurisdiction over him, and the district court appropriately responded to this challenge under the requirements laid out in *Garberg*. *Accord Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir. 1983) (taking issue with the fact that the district court denied the defendant's motion to set aside the default judgment "without considering the defendant's contention that the default judgment was void pursuant to Rule 60(b)(4) for lack of personal jurisdiction.") The district court cannot be faulted for holding this hearing only after it entered the default judgment where DiPanfilo, who admitted that he was aware of the litigation, failed to raise the challenge in a timely manner and where the record otherwise supported a prima facie finding of jurisdiction. We conclude, therefore, that the district court properly exercised personal jurisdiction over DiPanfilo.

**C.     DiPanfilo's challenge to the district court's subject matter jurisdiction and his argument that the court was required to hold an evidentiary hearing on damages before entering the default judgment**

We apply the de novo standard of review to the district court's determination in favor of subject matter jurisdiction. *City of Albuquerque v. U.S.*

*Dep't of Interior*, 379 F.3d 901, 906 (10th Cir. 2004). Subject matter jurisdiction under 28 U.S.C. § 1332(a) requires a diversity of citizenship between the parties and an amount in controversy that exceeds "$75,000, exclusive of interest and costs." *McPhail v. Deere & Co.*, 529 F.3d 947, 952 (10th Cir. 2008) (quoting 28 U.S.C. § 1332(a)). When faced with a challenge to the amount in controversy, the party seeking to assert federal court jurisdiction—in this case, Marcus Food—must demonstrate the potential to recover over $75,000 on its claims. *See Woodmen of World Life Ins. Soc. v. Manganaro*, 342 F.3d 1213, 1216 (10th Cir. 2003) (describing the plaintiff's burden as demonstrating that "it is not legally certain that the claim is less than the jurisdictional amount").

The amount claimed by the plaintiff in its complaint generally controls and "alone can be sufficient" to support subject matter jurisdiction. *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir. 2000); *see also McPhail*, 529 F.3d at 952 (noting that to maintain federal court jurisdiction, "all the plaintiff needs to do is allege an amount in excess of $75,000 and he will get his way"). "Although allegations in the complaint need not be specific or technical in nature, sufficient facts must be alleged to convince the district court that recoverable damages will bear a reasonable relation to the minimum jurisdictional floor." *Adams*, 225 F.3d at 1183 (internal quotation marks omitted)). The plaintiff may supplement the allegations in the complaint with "affidavits or other evidence." *McPhail*, 529 F.3d at 956.

Assuming that the plaintiff has met its prima facie obligation to establish the amount in controversy, then the defendant has an opportunity to challenge that showing. *See Watson v. Blankinship*, 20 F.3d 383, 386 (10th Cir. 1994). But this circuit has cautioned that "[t]he legal certainty standard is very strict. . . . [I]t is difficult for a dismissal to be premised on the basis that the requisite jurisdictional amount is not satisfied." *Woodmen of World Life Ins. Soc.*, 342 F.3d at 1216. Dismissal on amount-in-controversy grounds is generally "warranted only when a contract limits the possible recovery, when the law limits the amount recoverable, or when there is an obvious abuse of federal court jurisdiction." *Id.* at 1217.

Marcus Food presents damages in its complaint of $207,585, based on the parties' agreement that DiPanfilo would owe Marcus Food 45% of any net losses on his accounts. As support for the claimed amount, the record includes an affidavit from Marcus Food's Chief Operating Officer averring that $207,585 remains outstanding under the terms of the parties' agreement, as well as a prelitigation letter from Marcus Food to DiPanfilo requesting payment for outstanding itemized losses totaling $280,112. The losses asserted by Marcus Food thus easily exceed the minimum jurisdictional threshold of $75,000.

DiPanfilo has not come forward with any evidence or argument to support a determination that the damages claimed by Marcus Food were not made in good faith. Instead, citing our decision in *Venable v. Haislip*, 721 F.2d 297 (10th Cir.

1983), he argues that certainty as to the amount in controversy cannot exist because the district court failed to hold an evidentiary hearing on the amount of damages prior to entering the default judgment. In *Venable*, we explained that "a court may not enter a default judgment without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation." *Venable*, 721 F.2d at 300. But the damages claimed by Marcus Food, unlike those claimed in *Venable*, *are* capable of mathematical calculation. Further, Rule 55 of the Federal Rules of Civil Procedure, which governs default judgments, does not require that the district court receive evidence on the claimed damages amount before entering a default judgment; rather, the Rule simply allows the district court to conduct a hearing if it believes that additional investigation or evidence is necessary. Fed. R. Civ. P. 55(b)(2) (noting that the district court "may conduct hearings"); *see also Finkel v. Romanowicz*, 577 F.3d 79, 87 (2d Cir. 2009) (explaining that the decision to hold a hearing is within the district court's discretion).

DiPanfilo did not come forward with any grounds for the district court to believe that such a hearing would be necessary in this case. *See id.* (rejecting the argument that the district court should have held a hearing before entering the default judgment where the party seeking the entry of judgment "never asked for a hearing, and one was not necessary" since the party "assured the District Court

that entry of a default judgment . . . would entail no findings of fact or disputed questions of law").

**D.** **The district court did not abuse its discretion when it determined that DiPanfilo failed to demonstrate excusable neglect**

As an alternate basis for relief, DiPanfilo argues that the district court abused its discretion when it failed to resolve in his favor any doubts about the excusable nature of his neglect. He also points to an abuse of discretion in the court's alleged failure to weigh other factors—such as the lack of prejudice to Marcus Food and DiPanfilo's purportedly meritorious defenses—against his showing of excusable neglect. We review the district court's determination regarding excusable neglect under the abuse-of-discretion standard. *Hukill v. Okla. Native Am. Domestic Violence Coal.*, 542 F.3d 794, 796-97 (10th Cir. 2008)

DiPanfilo bears the burden of demonstrating excusable neglect and, only if he meets this burden, of showing a meritorious defense. *See Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1445 (10th Cir. 1983). All doubts in this equitable analysis are to be resolved in favor of the moving party—here, DiPanfilo. *Pioneer Ins. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Cessna Fin. Corp.*, 715 F.2d at 1445. Our determination is guided by the following relevant factors: "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within

the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Ins. Servs. Co.*, 507 U.S. at 395.

The district court concluded that DiPanfilo had failed to demonstrate excusable neglect because he could not explain why he required three months to locate counsel and an additional three month to file his motion. Even granting him the benefit of the doubt and attributing delays in locating counsel to the attorneys he contacted, DiPanfilo still has failed to provide any explanation for the subsequent months spent preparing his motion. The only excuse he offered was that his attorneys required time to gather the relevant facts and sometimes had difficulty contacting him. Based on this explanation, the court concluded that DiPanfilo "was not prompt in responding to his counsel's requests and inquiries—apparently this lawsuit was simply not a high enough priority for him."

The district court did not abuse its discretion when it concluded that DiPanfilo's lack of diligence toward the litigation outweighed any countervailing factors, such as the alleged absence of prejudice to Marcus Food. In addition, the court was not obligated to consider DiPanfilo's potential meritorious defenses unless it concluded that there was excusable neglect, and thus did not abuse its discretion when it declined to consider these defenses. *See Cessna Fin. Corp.*, 715 F.2d at 1445 (declining to consider the defendant's alleged meritorious defenses because the defendant failed to show excusable neglect).

## III.  CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.